**Slip Op. 25-24**

# UNITED STATES
# COURT OF INTERNATIONAL TRADE

**Court No. 20-00105**

CATFISH FARMERS OF AMERICA
and eight of its individual members,

*Plaintiffs*,

v.

UNITED STATES,

*Defendant*,

and

NTSF SEAFOODS JOINT STOCK COMPANY,

*Defendant-Intervenor*.

Before: M. Miller Baker, Judge

## OPINION

[The court sustains the Department of Commerce's redetermination.]

Dated: March 10, 2025

*Nazak Nikakhtar*, *Maureen E. Thorson*, and *Stephanie M. Bell*, Wiley Rein LLP, Washington, DC, on the comments for Plaintiffs.

*Brian M. Boynton*, Principal Deputy Assistant Attorney General; *Patricia M. McCarthy*, Director; and *Kara M. Westercamp*, Senior Trial Counsel, Commer-

cial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, on the comments for Defendant. Of counsel on the comments was *K. Garrett Kays*, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, Washington, DC.

*Baker*, Judge: This case arising out of the Department of Commerce's 15th administrative review of its antidumping order on Vietnamese catfish returns for its third visit.[1] In its most recent opinion, the court remanded for the agency to reconsider the choice of India, rather than Indonesia, as the primary surrogate country and the calculation of how Vietnamese producer and respondent NTSF reported its factors of production. *See* Slip Op. 24-23, at 4–10, 2024 WL 775181, at \*\*1–4 (surrogate country); *id.* at 10–12, 2024 WL 775181, at \*4 (NTSF's factors).

No party challenges the agency's redetermination of the latter question. The court therefore sustains it. Catfish Farmers, however, contest Commerce's reaffirmation of its selection of India. As explained below, the court sustains that pick as well.

---

[1] The court presumes the reader's familiarity with its previous opinions. *See NTSF Seafoods Joint Stock Co. v. United States*, Ct. Nos. 20-00104 and 20-00105, Slip Op. 22-38, 2022 WL 1375140 (CIT Apr. 25, 2022), and *Catfish Farmers of Am. v. United States*, Ct. No. 20-00105, Slip Op. 24-23, 2024 WL 775181 (CIT Feb. 26, 2024).

I

In cases such as this where imports originate from a nonmarket-economy country, the Tariff Act of 1930, as amended, requires Commerce to calculate the production costs—in the statutory vernacular, the "factors of production"—"based on the best available information" as to such costs "in a market economy country or countries [it] consider[s] to be appropriate . . . ." 19 U.S.C. § 1677b(c)(1).

The "market economy country or countries" referred to in the statute are known as "surrogate countries." *See, e.g.*, 19 C.F.R. § 351.408(c)(2) ("The [Department] normally will value all factors in a single surrogate country."). To select surrogate country candidates, the statute directs Commerce to use, "to the extent possible," market-economy countries that are "at a level of economic development comparable to that of the nonmarket economy country." 19 U.S.C. § 1677b(c)(4)(A).

As Catfish Farmers explain, "[w]here more than one potential surrogate country is economically comparable with the subject country, Commerce compares the relative quality of the [surrogate value] data available from each to select a primary surrogate country." ECF 118, at 5 (citing Import Administration Policy Bulletin 04.1, *Non-Market Economy Surrogate Country Selection Process* (Mar. 1, 2004)).[2] On remand, the Department grudgingly conceded that Indonesia and

---

[2] http://enforcement.trade.gov/policy/bull04-1.html. *See* ECF 67-1.

India are "at a 'comparable' level of economic development." Appx17545. In marked contrast to its prior determinations, it disclaimed "affording [any] preference to India." Appx17546.[3]

Having so leveled the playing field for the first time, Commerce then set out the rules of the game. In comparing competing datasets for selecting a surrogate country, the Department considers (among other things) whether they are publicly available, contemporaneous with the period of review, tax- and duty-exclusive, representative of broad market averages, and specific to the inputs. Appx17546. "There is no hierarchy among these criteria." Appx17546–17547. The agency "weigh[s] the available information" and "make[s] product-specific . . . decisions as to what constitutes the 'best' available [surrogate value] for each input." Appx17547.

## II

As relevant here, the Department reconsidered the Indian and Indonesian data for three inputs: whole live fish, fingerlings, and labor.[4] In reviewing the

---

[3] The agency's unlawful preference in its two prior decisions prompted the court to remand. *See* Slip Op. 22-38, at 38–40, 2022 WL 1375140, at *13; Slip Op. 24-23, at 4–6, 2024 WL 775181, at **1–2.

[4] The court's first opinion sustained the agency's explanation for its use of Indian, rather than Indonesian, financial statements. *See* Slip Op. 22-38, at 52, 2022 WL 1375140, at *17 ("Commerce explained why it considered one Indian company's financial statement reliable and why it found the Indonesian statements inadequate, and it then chose

agency's findings, "the court's duty is not to evaluate whether the information Commerce used was actually the best available, but rather whether a reasonable mind could conclude that [it] chose the best available information. Affirming the Department's determination requires a reasonable explanation from Commerce that is supported by the administrative record." *Jiangsu Zhongji Lamination Materials Co., (HK) Ltd. v. United States*, Ct. No. 21-00138, Slip Op. 23-84, at 11, 2023 WL 3863201, at *4 (CIT June 7, 2023) (cleaned up).

---

to give priority to the single-country preference over the two-statement preference."). Similarly, the court's most recent opinion sustained the Department's reliance on the Indian fish feed data. *See* Slip Op. 24-23, at 8, 2024 WL 775181, at *3. Although the Department provided additional reasons for these conclusions, which resulted in the parties addressing them again, the court's prior decisions on these questions are law of the case.

In previously sustaining the agency's findings for fish feed, the court observed that Catfish Farmers did not dispute the agency's citation of a source called *Undercurrent* to back up *Fishing Chimes*. *Id.*, 2024 WL 775181, at *3. Catfish Farmers now object that the court erred in so finding. *See* ECF 118, at 15 (citing ECF 86, at 32–33). Their comments mentioned *Undercurrent* once in a single sentence and then argued that "data points may be 'corroborated' yet still not represent a broad market average." ECF 86, at 33. They did not meaningfully dispute the Department's reliance on *Undercurrent* as corroborative. Passing references do not raise arguments. *ArcelorMittal France v. AK Steel Corp.*, 700 F.3d 1314, 1325 n.6 (Fed. Cir. 2012) ("ArcelorMittal makes passing reference to other [issues], but [it] has not briefed those issues sufficiently to preserve them.").

*Whole Live Fish*

As to whole live fish, the Department noted that the Indian information came from a trade publication called *Fishing Chimes* and the Indonesian figures consisted of government data. Appx17547. The agency previously found that the former represents a broad market average and rejected the latter as less desirable because they were not species-specific and were only partly contemporaneous with the period of review. *Id.*

The court directed the Department to reconsider whether *Fishing Chimes*'s data for whole live fish reflected a broad market average. *See* Slip Op. 24-23, at 9, 2024 WL 775181, at *3. The agency again found that they do. Appx17548. It explained that *Fishing Chimes* focuses on the Indian state of Andhra Pradesh, which was responsible for about 60 percent of the country's pangasius farming during the relevant years. *Id.* It also observed that no other state came anywhere close to that figure. *Id.*

In response to Catfish Farmers' contention that the study addressed two districts within that state but also appeared to include 254 villages outside of those districts, the Department found that the latter issue does not render the data unrepresentative or unusable. Appx17549. It explained that the 46 villages located within the two districts are a large number of data points and that the inclusion of villages located elsewhere in the state buttresses the "broadly representative nature of the data." *Id.*

The court's previous decision also observed that the agency analysis cited *Fishing Chimes*'s references of 28 million kg of fish during 2017–18 and 14 million kg during the period of review but did not show how that amount compares to India's overall pangasius production. Slip Op. 24-23, at 9, 2024 WL 775181, at *3. Commerce acknowledged that those figures are a fraction of the overall total but said that fact is neither surprising nor problematic because survey methodology seldom covers an entire population and instead focuses on groups or regions with significant concentrations of data. Appx17550. It found that *Fishing Chimes* represents a broad market average both because of the "size/location of the sample" and because the study contains "numerous indicators . . . that demonstrate that the data were tested for representativeness." Appx17551.

Catfish Farmers do not dispute that Andhra Pradesh is the largest-producing state in India, but they object that *Fishing Chimes* does not address either how many actual *farms* (rather than villages) are in that state or in the relevant two districts, or what percentage of production the studied farms represent in those areas. ECF 118, at 11. Nor, they assert, is there any actual volume data, either on an absolute basis or as a percentage of overall sales. *Id.* They contend that the monthly data are too limited and not all farms provided figures for every month surveyed. *Id.* at 11–12.

Commerce responded to the last point by observing that not all fish farmers seed and harvest on the same schedule, so they do not have data for every month. Appx17571. The *Fishing Chimes* researchers therefore

conducted their study over a two-year period instead of "relying on any given month as a snapshot." *Id.* The Department also found "farm-specific information" unnecessary because the "estimated aggregate production volume covered by the survey is substantial." Appx17571–17572. The agency explained that the study identified its sampling methods, data collection methodology, analysis methods, corroborating steps, findings, and conclusions, and it also observed that the Indonesian figures Catfish Farmers submitted do not contain the level of specificity on which the group is insisting. Appx17572–17573. Commerce concluded that nothing in the record shows that any of the practices and pricing patterns discussed in *Fishing Chimes* would not be representative of other regions in India or that the researchers did not cross-check the data as stated in the report. Appx17572.

The Department also found the Indonesian whole live fish data problematic because, unlike the *Fishing Chimes* information, they are not species-specific. It responded to Catfish Farmers' assertion that pangasius is the predominant species farmed in Indonesia by quoting two letters from Indonesian government officials saying the data were not species-specific and they had no information about the dominant species' actual percentage. Appx17573. Commerce also noted that while the record does contain an affidavit referring to such a percentage, it cites no evidence supporting its assertion. Appx17573–17574. Thus, the agency concluded, the Indonesian information covers multiple species and provides no way to determine what figures relate to the type of fish under consideration here. Appx17574. Finally, it added, it is irrelevant whether

the Indonesian figures might represent a *broader* market average than their Indian rivals provided the latter are sufficiently representative, especially if—as Commerce found—the latter are better as to specificity and contemporaneity. *Id.*

As the government correctly points out, *see* ECF 117, at 31, the question for the court is not whether the Indonesian data are usable—it is whether they are the *only* reasonable selection. "An agency finding may still be supported by substantial evidence even if two inconsistent conclusions can be drawn from the evidence." *Viet I-Mei Frozen Foods Co. v. United States*, 839 F.3d 1099, 1106 (Fed. Cir. 2016). Commerce has adequately explained why it deems the Indonesian whole live fish data inferior. As to whether *Fishing Chimes* represents a broad market average, drawing data from multiple sources' actual experience within a country's largest-producing area is an acceptable way to determine that. *See Hangzhou Yingqing Material Co. v. United States*, 195 F. Supp. 3d 1299, 1311 (CIT 2016). No party disputes that Andhra Pradesh is the largest-producing area in India, and Commerce reasonably explained why it was satisfied that the study's methodology was statistically valid. Accordingly, the court sustains the agency's finding that *Fishing Chimes* represents a "broad market average" and is preferable to the Indonesian whole live fish data.

*Fingerlings*

The court directed the agency to reconsider its findings on fingerlings because the latter essentially assumed that *Fishing Chimes* represented a "broad

market average." *See* Slip Op. 24-23, at 8 n.3, 2024 WL 775181, at \*3 n.3 (citing Appx017436).

On remand, Commerce found that publication's data superior to the Indonesian information proffered by Catfish Farmers for three reasons—(1) the former were "based on responses from numerous farmers and . . . corroborated by field visits and comparisons to other data sources"; (2) the latter was less specific as to species; and (3) most importantly, unlike the former, the latter did not cover fingerlings over five inches in size. Appx17553. The agency emphasized that NTSF reported using fingerlings of 5.7 inches or larger. Appx17576. It noted that the Indonesian government official who provided that country's information failed to state how the figures were determined and gave no citations to source or corroborating information. Appx17577. Commerce also observed that while Catfish Farmers complained that the Indian figures lacked volume data, the Indonesian information did as well. Appx17576–17577. For these reasons, the agency found the Indian data superior as to fingerlings. Appx17553.[5]

Catfish Farmers now assert that the Indian fingerlings data are too limited to represent a "broad market average." They contend that *Fishing Chimes* participants bought fingerlings locally in Andhra Pradesh

---

[5] Because the fish feed and fingerlings inputs combined make up almost two-thirds of normal value, the Department noted those two categories provided sufficient reason to "determine that India provides superior data to value a sizeable majority" of normal value. Appx17577.

but that the study says most of India's fingerling production occurs in a different state, West Bengal. ECF 118, at 13 (citing Appx13789, Appx13827–13834). Catfish Farmers argue that there is no way to verify whether the pricing studied is representative of India at large.

The government responds that Commerce's analysis for fingerlings tracks with its "whole live fish" explanation because the prices discussed in *Fishing Chimes* "reflect the purchase prices in the largest producing region in India," which means they "represent the actual experience of pangasius producers in Andhra Pradesh." ECF 117, at 24–25 (citing Appx17577 and *Hangzhou Yingqing*, 195 F. Supp. 3d at 1311); *see also* Appx17577 n.204 (explaining that Catfish Farmers' argument is "inapposite, because regardless of the source, the prices reflect the purchase price of fingerlings in the major producing region of India").

The group's other main objection is that *Fishing Chimes* does not indicate "the volume of fingerlings reflected in the data presented." ECF 118, at 14. Catfish Farmers presented that argument to Commerce, however, which reasonably explained that the Indonesian sources likewise do not include that sort of information and do not discuss the number of districts, provinces, or respondents providing pricing data. Appx17577.

The court sustains the Department's conclusion regarding fingerlings. The agency adequately explained why it found the Indian data superior and responded to Catfish Farmers' objections. That's all the law demands.

*Labor*

The final data quality issue involves labor costs. The Department acknowledged that the Indian labor information is not contemporaneous with the period of review but explained it chose those figures anyway (after applying an inflator) under its policy of choosing data from one country insofar as possible. Appx17555–17556. That is, it deemed the Indian information better overall, especially as to whole live fish, fish feed, and fingerlings, and found the labor figures "usable." *Id.* It also found no basis, other than contemporaneity, for deeming the Indonesian data superior. Appx17554–17555. The agency explained that it will use a secondary surrogate country only when data from the country with higher quality information overall are unavailable or unreliable. Appx17580–17581. Because India is superior overall, it was better to use its labor data to avoid distortions. *Id.*

Catfish Farmers argue that Commerce did not explain why it was reasonable to rely on non-contemporaneous labor data when Policy Bulletin 04.1 emphasizes contemporaneity. ECF 118, at 32. They assert that the Department "must put forth independently reasonable grounds for relying on outdated data" and did not do so here. *Id.* at 33.

The government responds, essentially, that the Indian figures' non-contemporaneity was their only significant weakness such that the agency deemed it more important to use information from a single country as much as possible. ECF 117, at 40–41. The case law the government cites recognizes that "[c]ontem-

poraneity is only one of several factors Commerce weighs in selecting among qualified surrogate country candidates under Policy Bulletin 04.1." *Jiangsu Zhongji Lamination Materials Co., (HK) Ltd. v. United States*, 396 F. Supp. 3d 1334, 1350 (CIT 2019); *Heze Huayi Chem. Co. v. United States*, Ct. No. 17-00032, Slip Op. 18-57, at 19, 2018 WL 2328183, at *8 (CIT May 22, 2018) (noting parties' agreement that contemporaneity is only one factor "when choosing the best available information to use as surrogate values").

The court interprets the Department's analysis as a finding that neither country's labor data were superior on their own merits. *See* Appx17555 (characterizing the Indian figures as "usable (if not preferable)"). To break the tie, Commerce had to choose between two regulatory preferences—one favoring contemporaneous data, the other data from a single country where possible. It deemed the latter more important "to limit distortions resulting from mixing and matching [surrogate values] from different source countries." Appx17581. Such weighing of preferences is the agency's prerogative. *See* Slip Op. 22-38, at 52, 2022 WL 1375140, at *17 ("It is not this court's role to balance those preferences. Commerce explained why it considered one Indian company's financial statement reliable and why it found the Indonesian statements inadequate, and it then chose to give priority to the single-country preference over the two-statement preference."). Thus, the court finds the Department's decision to use the Indian labor data reasonable and supported by substantial evidence.

\*     \*     \*

For these reasons, the court sustains the Department's redetermination. A separate judgment will issue. *See* USCIT R. 58(a).

Dated: March 10, 2025      /s/ *M. Miller Baker*
       New York, NY       Judge